2-0-3-6-4 Collins v. Yellen. Mr. Thompson. Chief Judge Yellen and may it please the Court, the Supreme Court's remand leaves open two fundamental questions for this Court to decide. The first question is whether shareholders suffered compensable harm caused by the unconstitutional removal restriction. In order to demonstrate compensable harm, it's sufficient for us to show that the President would have fired one of the Senate-confirmed directors who implemented the net-worth sweep. We've made that showing. In a recent letter to Senator Paul, former President Trump said he would have fired Director Watt on day one of his administration if the law had clearly allowed him to do so. And wholly apart from the Trump letter, the contemporaneous evidence independently establishes the same thing. Director Watt was confirmed with only two Republican senators supporting him. President Trump swiftly removed from office the other financial regulators who had been appointed by President Obama. President Trump replaced Director Watt with an acting director on the very first day he had an opportunity to do so. And so there can be no doubt that President Trump would have fired Director Watt at the beginning of his term if he had been permitted to do so. And that showing alone establishes that we have suffered compensable harm and are entitled to retrospective relief. So the second question before the Court is, what should that relief look like? We submit that the Court should enter an injunction that puts shareholders in the position we would have been in in the absence of the constitutional violation. And so it's necessary for Senator Watt for the Court to determine what the Trump administration would have done if it had controlled FHFA for an additional two years. When we were previously gathered together, a majority of the Court wasn't convinced that the four-cause removal restrictions had stopped any policies that would have benefited shareholders. But when the Court issued its en banc opinion, it did not have the benefit of the Trump letter, and it did not have the benefit of 16 months of additional regulatory actions and pronouncements by the Trump administration from the time of the en banc decision to the end of the Trump administration, during which time it made clear it was pursuing two policies. First, ending government ownership of Fannie and Freddie by selling off the Treasury's common stock, and second, recapitalizing and releasing the companies from conservatorship. Neither of these policy objectives could have been accomplished without eliminating the massive liquidation preference of the Treasury's senior preferred stock. As long as that liquidation preference is outstanding, the common stock has no value. Treasury can't sell it. The companies can't sell additional common stock. No investor wants to buy security where all the value is going to somebody else. And so that's why we're entitled to a remedy that eliminates the liquidation preference, either by the FHFA writing it down or Treasury converting it into common stock. We know this is something the Trump administration would have done if it had had the additional time, and awarding this remedy is the only way to put shareholders in the position they would have been in but for the unconstitutional removal restriction. The Trump letter makes it abundantly clear that the Trump administration planned to sell its stake in the companies and to privatize the companies. Now it's true this letter was written after President Trump left office, and the Supreme Court gave two examples of the types of evidence that would conclusively establish harm, and the unifying theme of those examples is to try to get into the mindset of the president, and we submit that this letter does so. Nothing in the opinion suggests that the courts can blind itself to statements of former presidents. And here again, they're wholly apart from the Trump letter. There is a wealth of contemporaneous evidence that shows the same thing. From the beginning, the Trump administration signaled its commitment to the FHFA in January of 2016, when then nominee Mnuchin said as much in his first interview. The court can also take judicial notice of the fact that Mark Calabria, who became the director of the FHFA, had written a paper for the Cato Institute where he called the network sweep illegal and bad policy. The court can take judicial notice of the fact that once Director Calabria came into office, he took concrete steps in furtherance of the Trump administration's goals. He ended the practice of paying cash dividends on Treasury's senior preferred stock within months of taking office. Indeed, just three weeks after this court entered its en banc decision, Director Calabria and Secretary Mnuchin amended the PSPAs to turn off the cash dividends. Director Calabria also prepared a capital rule that was necessary before there could be a stock offering. That capital rule was finalized on December 17, 2020, just a few weeks before the end of the Trump administration. Director Calabria hired financial advisors to assist with the stock offering, and Director Calabria announced that there would be a stock offering in 2021, but the Trump administration ran out of time. Most of these statements and events occurred after this court's previous en banc decision, and they're subject to judicial notice, just as this court took judicial notice of other actions by FHFA directors in its prior opinion in this case. And once the court considers all the actions the Trump administration and Director Calabria took in furtherance of reforms that could not be completed without eliminating the liquidation preference, it becomes evident that the administration would have eliminated the liquidation preference. But if the court isn't sure about that, it should shift the burden onto the government. This is a common feature of constitutional cases under the tiers of scrutiny. If a plaintiff can demonstrate that a law implicates the First Amendment or the Equal Protection Clause, the burden shifts onto the law. And burden shifting makes sense here, given the importance of the rights at stake. We've proven compensable harm under the Supreme Court's opinion, and any uncertainty about the but-for world ought to be resolved in our favor. When this case was previously before the en banc court, there was a concern that we were picking and choosing our remedy. But the remedy that we instead were simply asking the court to order the defendants to do what the Trump administration would have done absent the constitutional violation. Nor is the President's control of Treasury a reason to withhold relief. While President Obama could have blocked the adoption of the network sweep through his control of Treasury, President Trump needed control of to appoint a director in whom he had confidence. And once his director was there, he started implementing the President's policies in large degree. The en banc court's previous opinion on the remedy for our constitutional violation also claimed that President Trump supported the network sweep because he did not direct the Department of Justice to stop defending it. But there's a strong norm within the executive branch to defend agency action, even if the administration doesn't agree with it. And the administration was entitled to end the sweep on its own terms without capitulating to shareholders. The government has claimed that what we're proposing is a massive giveaway, but that couldn't be farther from the truth. This is a precondition to allowing the government to unlock massive value through the selling its common stock. The government says there were a lot of options that were covered in the Treasury report from September 2019. And be that as it may, the next 16 months demonstrated what options the Trump administration were going to follow. And it was selling the government's stake, and it was ending the conservatorship. Justice Kagan suggested this court has already resolved the issues for remand. That's not true. This court was looking at whether the president's control of Treasury could have blocked the adoption. We're not talking about the adoption of the sweep anymore. Finally, the court may have concerns about, well, can we really enter summary judgment for you at this time? And my friends on the other side have been content to rely on, number one, legal argumentation, and number two, on inferences from the material that both sides have submitted subject to judicial notice. And there's every indication that the Supreme Court would prefer this case to be decided without discovery if it's possible to do so. And I welcome the court's questions. Mr. Thompson? Yes. Good morning, sir. This is Judge Higginson. Just a question about relief, because I think I'm correct. You were in front of the Eighth Circuit in the Bhati case? Yes, Your Honor. Would it be fair for me to assume, I didn't go back to the briefs, that you argued identically that you were requesting a remand to enter an injunction or in the alternative to order discovery, but that the court there just simply remanded without opining anything about burden shifting discovery or injunction? Is that correct? Your Honor, we argued that in October of 2019, and then it was put on pause for several years. And so, I don't believe there was extensive briefing on the remedy, but I apologize if my memory is deficient. But you're familiar with their order, and in fact... Yes. Yes. So, they just sent it back without any guidance whatsoever to the lower court. And with all respect, we think it would be very beneficial to a district court to have guidance, because the issues, if we are in full discovery, there will be sensitive issues relating to the presidential privilege, deliberative process privilege, and for the district court to have some sense of the rules of the road, we think would be very beneficial. Mr. Thompson, Judge Jones here. The Supreme Court remanded for determination of compensable harm. As I understand it, you're asking for an injunction. And normally, an injunction is only available in the absence of liquidated damages. I inferred from Collins that the court meant monetary damages. How do you reconcile that with your position? Your Honor, I think the Supreme Court understood that we were proceeding under the federal, the inherent equitable powers, the equitable powers of the court, and under the APA, neither of which would have entitled us to money damages. And when you're dealing with something like the separation of powers harm, you're dealing with irreparable injury. I think an instructive and illustrative example would be the First Amendment. Under Elrod v. Burns, there's always irreparable injury, the plurality said, whenever there's a First Amendment violation. And that's true even if you're a bookseller who's been denied the ability to sell books, and someone could say, well, we could just give you the money for the books, the profits you would have made on the books. And that just doesn't do the trick. And likewise here, we're talking about a liberty interest. And so we've been irreparably harmed and are entitled to injunctive relief. And the court would have understood that given the nature of the causes of action we have. Well, then in terms of your compensatory or your relief, I think all indications, and I've read a number of the reports and directives issued between 2016 and 2020, are that unwinding the net worth sweep was not going to be as easy as a pen and a phone, so to speak, executive action. That although even as late as 2020, I believe, when Director Calabria was contemplating a sale of the Treasury stock, there would still be at very least an interval of time. So that implies that the retrospective relief has to, even if one goes back to 2017, has to start at 2018 or 2019 at the very least, if at all, right? Your Honor, I would make two points. Number one, I think that your question points to the fact that this is hard, what the Supreme Court has asked us to do. And I made this point to Justice Alito. I asked him not to impose this test on the very grounds that it was hard. And he said to me at oral argument, I quote, sometimes we have to do hard things, close quote. And so this is difficult, but the court is absolutely right, Your Honor, that this was a multi-step, multi-year process. That's why in the Treasury report issued the day before the majority on bank opinion came out, it said that we want to end the conservatorships, quote, as promptly as practicable, as promptly as practicable. And so that was a multi-step process. Step number one was keeping the cash at the companies. They did that in September of 2019. Step number two was to have financial advisors come in. Step number three was to allow the net worth to grow. They made that change to the PSPAs. Step number four was to have a capital rule in place because no investor is going to come in until they know how much capital do these companies need to be out of conservatorship. And they did that final step in December 17th of 2020. And then the next step, which was to have a capital rule in place in December of 2021. So what does an injunction, a retrospective injunction covering four years accomplish? Well, what it would accomplish is it would put us in the position we would have been in, but for the unconstitutional provision. In the absence of that provision, the government would have written off the liquidation preference. And what, if anything, as I, maybe I'm wrong, but I had the, drew the inference that the current treasury and PSP and director are still talking about the possibility of some, of getting out of the conservatorships. They may be talking about it, but the harm that was visited on us was that Trump administration was absolutely committed to doing it. If we look at the president's directive of March, 2019, which is what led to the treasury report, the number one, the first objective that the president listed was ending the conservatorships. And it was ending the Obama, Biden administration's rule of the network sweep. And so it shouldn't be surprising that the Biden administration is less eager to undo the Obama administration's handiwork than the Trump administration was. And it's simply not sufficient to allow this administration to, to take its time. The Trump administration, this was a top priority. We can see it in the presidential directive, but this is hard. And again, this goes back to the burden of proof. The burden should be on them. This is what happens. Mr. Thompson, you say it's difficult and you say it was a top priority of the Trump administration, but the, if I'm right, the shareholders argue that to end conservatorship, the FHFA and treasury, two things, one, they would have reduced treasury's liquidation preference to reassure new investors that they could receive a return on their investment. Or number two, they would have converted the treasury's preferred stock to common stock. And my question is, what do you do with the fact that during the Trump administration, the treasury's liquidation preference increased and the treasury's preferred stock was not converted into common stock? Yes. So let me first say, your honor, those are two sides of the same coin because the purpose of either one of those actions would be to reduce the liquidation preference to zero. In other words, if there was a conversion, it would reduce it to zero, but there are a multiplicity of reasons why they did not actually write the liquidation preference off. Number one is they would be well within their rights to want to talk to the market participants who are going to buy the stock about the best way to maximize the value of their 79.9 percent stake. And they couldn't have those conversations until the capital rule was in place in December of 2020. In addition, by not writing it down and keeping the increase going, they made it so that if they did do a conversion, all other things being equal, they could take even more of the common. So it was a way to maximize. The president's letter talks about selling the stock at a huge profit. Well, that's a way to make it a huge profit. You get more of the common if you allow the liquidation preference to grow in the run up to the conversion. In addition, the warrants entitled the government to 79.9 percent of the companies. That number has significance. We know this from the Starr decision out of the Court of Federal Claims, which dealt with AIG. And that court explained that the reason it's set at 79.9 percent is because if the government's equity stake goes over 80 percent, they have to carry the companies on the balance sheet of the federal government. And so one reason to wait to write the liquidation preference off through a conversion, for example, is to minimize the amount of time you have to keep Fannie and Freddie with their trillions of dollars of assets on the balance sheet of the United States. So for all those reasons, it would make sense to wait. But the important thing is they could not have accomplished their objective without taking this last step. And there's every indication they would have. I guess a question I have is why is former President Trump's letter to Senator Paul that you let off with? Why is that letter better evidence of what President Trump would have done than what the Treasury actually did during the Trump administration? Well, Your Honor, I think first of all, with a unitary executive, I think that the Supreme Court gave two examples in its opinion of the type of evidence that would conclusively establish. And both of them got into the mindset of the president. But here we don't have to. We don't have attention because if we look at the contemporaneous evidence within three weeks of this court's en banc decision, Secretary Mnuchin agrees with Director Calabria, who'd only been there for a few months. We're going to stop the cash dividends, number one. Number two, Secretary Mnuchin agrees, I will allow the companies to build net worth. They now have $67 billion of net worth. And so those two things, those two actions by Treasury were critical underpinnings. There's no way to end the conservatorship or sell the stock at a huge profit if you don't have those things. They did those things. Then Mnuchin is waiting on Calabria for the capital rule. That's something Treasury can't do. That is all FHFA in its capacity as regulator. And it's complicated. As Judge Jones indicated, this isn't something you snap your fingers and it just turns to. And so that took until December 17th, 2020, and Calabria was crystal clear that we're going to sell the stock sometime in 2021. And so the two years makes a difference. When you talk about all these steps that would have been that demonstrate the contrary of Judge Willits' question about why didn't the Treasury write off stock, are those matters of evidence or judicial notice? Well, I think there's something that the court could take judicial notice of. Certainly, the fact that 79, it's, I believe, a rule of accounting that the star court pointed to saying that if the equity stake is more than 79.9%, it has to go onto the balance sheet of the companies. So that's something that follows from law. And the other aspects of my answer, I think the court could take judicial notice of. How do we take judicial notice? Because I don't remember those points about increasing why you suggest the liquidation preference was increased and the fact that that was increasing value to the Treasury so that it would get more money in a spinoff. I don't, I mean, I didn't see that in your briefing. Well, it wasn't in the briefing. We were just responding to a question from the court here today. But what I would say is that's math, Your Honor. Well, you can't assume that all of us judges understand financial math, that's all. Well, and that's a fair point. And I didn't either before these cases. What I would say is this, when you're dealing with a conversion, it is what it suggests. It is taking one stock and converting it into another stock. And all things being equal, the more you have of the the more of the new security you get here at the common. And so by allowing the liquidation preference to increase, it is just a mathematical fact that you would get more of the common stock, all other things being equal, when you did the conversion. And so the court can take judicial notice of that. It's just really a mathematical point. Well, but are you diluting the shareholders at the same time? There would be dilution to the shareholders at the same time. Yes. And so the shareholder, not the junior preferred shareholders and my clients own both, but the common shareholders would be diluted and they would much prefer to have the liquidation preference written off. And there might be reasons the government would want to do that. Perhaps market participants would think that this is better for the common stock and the government will be able to sell its position at a better price. But certainly it would not be diluted for the junior preferreds. And I see that I'm out of time, but I'm happy to reserve my five minutes, if I may, Chief Judge Owen for rebuttal. Thank you, Mr. Katter. Thank you. Good morning. Good morning, Chief Judge Owen, and may it please the court. I'm Rob Katerberg. I'll be speaking for FHFA this morning. Mr. Sendak will follow me and will speak for Treasury. Plaintiff's new theory is flawed on many levels. It's far astray from what the Supreme Court suggested could be a possible avenue for further litigation on remand. It's barred by principles expressed in this court's prior en banc opinion and remedy on remedy in this case. And it defies limitations on judicial review that are both in the Recovery Act and basic principles of administrative law. It involves multiple layers of speculation refuted by real-world histories. First, Your Honors, it's important to recognize at the outset that the theory that they are now pursuing bears no resemblance to what they argued to the Supreme Court, to what's in their complaint or anything in the first five years of this case. The case was always and only about the Third Amendment, which was a specific discrete action, a 2012 amendment that changed the formula for remand. What the Supreme Court envisioned this remand as being for is giving them the opportunity to argue that specific actions implementing the Third Amendment were against the will of the President and happened the way they did only because of the removal restriction. What they've now turned to arguing, however, has nothing to do with the Third Amendment. Mr. Thompson's theory today could stand independently even if there was never any Third Amendment because what he's now after is to overhaul the original underlying preferred stock purchase agreements in the manner they exist since 2008 and zero out Treasury's liquidation preferences. That is a sea change in their theory. Now, it still runs up against the same problem this Court identified in its prior remedy opinion, which is with Treasury being the master of its investments and the administration always having plenary control over Treasury. If their grievance is that Treasury is getting a too sweet a deal, the consideration was too much. That was always within the administration's control to deal with. My colleague who's going to speak for Treasury will have more to say about that. Mr. Kitterberg, why is the solution here not that you can just take this up with the District Court? You agree that we have to send it back to the District Court at least for entry of judgment on the constitutional claim, right? Yes, Your Honor. A one-line remand to send it back for entry of judgment on that. But, Your Honor, there are several threshold legal obstacles, and that's what I'm getting to. There's several threshold legal obstacles to their claim. There's also the problem that it's factually implausible. I think that would be an independent bar. I certainly understand the factual argument, but normally when people have factual disputes, we let the District Court resolve those in the first instance. So what would be the best precedent for the idea that here as the intermediate court between the remand from the Supreme Court and as you concede in your brief and again this morning, obviously it has to go back to the District Court for entry of judgment on something in the plaintiff's favor. Why not just let the District Court do all of this? You can raise your arguments to the District Court about the legal claims. You can raise your argument to the District Court about the factual claims, and then it would allow our court, assuming that there was another appeal, to sit as a court of review, not first view, as we've often said we do. Certainly, Your Honor. Well, it would end up being a round trip, essentially, because we do have a number of threshold legal obstacles. We think that the claim that they're arguing is not viable legally without even need to reach the factual plausibility. This court is sitting en banc. You're familiar with the background, familiar with the issues from having sat en banc for the prior opinion on remedy, which has much to say about the situation that's now before us, and so we think the most efficient course, best for judicial economy, is to go ahead and confront those issues and direct the court to enter a final judgment on all of the claims. Where it's different from the prior theory that they were advancing before is that it's now gone from complaining about specific actions to inaction, failure to take action, and that's a fundamentally different claim and it's subject to strict limitations under Supreme Court precedent. As Justice Scalia wrote for a unanimous court in Norton versus Southern Utah Wilderness Alliance, that kind of claim, a claim for failure to act, will be only possible for a discreet agency action that the agency is required to take. What they're now faulting us for not doing is not discreet and certainly wasn't required. In fact, as we've explained in our brief for the first year of the Trump administration, there was a statute that forbade touching the liquidation preference, which shows how sacrosanct Congress considered Treasury's investment to be. These limitations on judicial review are consistent, Your Honors, with limitations on separation of powers remedies more generally. For example, we now see a number of appointments clause cases. Usually when people are bringing up those issues, they are challenging specific outcomes of adjudication. Occasionally you see people trying to stop adjudications in their tracks, but the common thread of that is that there is adjudication taking place. There's a specific agency action. What you don't see in any of these cases is a challenge to inaction, an effort to rewind the clock and rewrite history by hypothesizing how executive policy would have evolved into something different if an unconstitutional provision hadn't been in effect. And I certainly understand that argument, but of course the Supreme Court has directed that exact result. As Mr. Thompson pointed out in his argument, that Justice Alito's opinion says that this is that we're supposed to have a remand about this counterfactual world that doesn't exist. And so I guess the question goes back again to if there has to be litigation on this, and the Supreme Court has specifically said there must, why wouldn't we just send it to the district court? And you can make all of these arguments to the district court about what you think the counterfactual world might be, what it might not be, what legal obstacles there might be. I go again, do you have a case that says that the best way to do this is for us to resolve it in the first instance, whether it's your threshold legal case, your questions, or these factual disputes? Well, Your Honor, we're in uncharted territory here, so I don't think there's a case in either direction. However, what I would say to Your Honor is the case that Mr. Thompson is here advancing today is fundamentally different from what Justice Alito and the court thought him to be advancing. Again, that was about a challenge to specific, discrete acts implementing the Third Amendment. That's a sea change under administrative law under cases like Norton, and as Justice Thomas said in his concurring opinion, our watchword should be caution in this area, because recognizing new private rights of action places great stress on the Constitution's separation of legislative and judicial power, and nothing in the majority opinion licenses the direction in which plaintiffs are now going. But there's also a more direct bar to plaintiffs' requests, which comes directly out of the Recovery Act, and that's Section 4617F, which bars relief that interferes with FHFA's exercise of its functions as conservators. The injunction that Mr. Thompson is seeking, which would compel FHFA to basically rip up the preferred stock purchase agreements and replace them with a regime that's more friendly to junior shareholders, that's the archetype of relief that would improperly functions. The first thing FHFA did as conservator in 2008 was to enter into these agreements to get a one-of-a-kind commitment from Treasury to keep housing finance markets running with the liquidation preference as the key pillar for consideration of the term. Now, what you're going to hear from Mr. Thompson on rebuttal is that 4617F can't apply to constitutional claims, but we now have the test from the Supreme Court as to when it applies and when it doesn't apply. 4617F bars relief that would affect actions, or here would be inactions, that fall within the scope of the agency's authority as a conservator. And one thing we know conclusively from Collins is that the removal provision at no time divested any FHFA official of constitutional or statutory authoritative act. And Justice Thomas, again, in his concurrence, he expressly noted in footnote 7 that as the plaintiff's claim now seemed to be evolving, and again, now it's basically turned into an APA claim, that agency action is skewed because of a misperception about the validity of the removal provision. And Justice Thomas said in footnote 7, we need to consider the interaction between the claim and the anti-injunction provision. And, Your Honor, aside from these multiple statutory obstacles, the relief plaintiffs are now seeking would raise profound separation of powers concerns of itself. And that's because what they're trying to do is to use the courts to basically force the current administration to carry out what plaintiffs say was the housing and economic policy. And I want to ask about that because, you know, if we do, if we did remand it, we have a different president than President Trump, who maybe doesn't agree with every single thing President Trump did. And so if this spends a while in the district court, there is also the possibility there would be yet another president by the time it's back to us. And so I guess I'm just wondering, when do we end this? And is that part of your concern about remanding, that this just sort of never ends, this situation? Well, that's exactly right, Your Honor. And that's where section 4617F and article 2 are completely aligned, because where these matters belong, where these significant matters of national economic policy belong, is with the executive branch. Article 2 says there's a four-year term, there's a different president now, there may be a different president in the future. And it doesn't make sense to erode the actual ongoing power of the president and FHFA to oversee these important matters in the name of promoting Article 2 principles. So, Your Honor, those, all those legal bars compel... On that topic of kind of the president being in charge, I didn't really understand the answer that your opposing counsel gave on the issue of the Department of Justice being able to have taken a different position than they took. I mean, I've been on this case from the start, in our court anyway, and they were defending a great deal of this, and then later said, no, it's not constitutional. And so, obviously, they don't always defend every single thing that agencies do and don't always agree with every single law. Am I right on that? I've certainly seen them take different positions, and that's when the Supreme Court has to appoint an amicus and so forth. So why couldn't, from the start, you all have said, we agree, we think this third sweep is a mess and we want to do something else. Well, that's exactly right, Your Honor. To clarify, I'm not with the Department of Justice, Mr. Shinstack, who will follow me, is, but it's exactly right that the administration, at a variety of instances, doesn't defend a particular policy or doesn't defend a particular statute. And if Mr. Thompson's counterfactual was correct, that the administration really had it out for the network sweep and really wanted to get Treasury's liquidation preference out of the way, it doesn't make sense at all that they actually behaved, they actually did the things they did, both in court and in the economic arena, with the actual actions for reform of the GSEs. I want to correct- Couldn't you all, all three of you have, I know which side you represent, I was just getting your position, but couldn't all three of you, the FHFA, the Treasury, and the plaintiffs, have tried to settle the case? Absolutely. That's always a possibility, and Your Honor- If President Trump thought that was important, couldn't that have been something that was done? Absolutely. If President Trump had wanted to do the things that Mr. Thompson is attributing to him, many, many things would have turned out differently throughout the administration, and particularly in the last two years of the Trump administration, when he had his hand-picked representatives at the helm of both FHFA and Treasury. If the inquiry is how might the world have turned out differently if President Trump had been able to put in his own FHFA director in 2017, and again, we don't think you even really need to get there because we think there are these threshold legal bars, but if that is the inquiry, by far the most probative thing for guiding that analysis has got to be what actually did happen in those final two years. That's consistent with the approach this court took in the prior von Grimmedy opinion, but it looked at the fact that new presidents came on, and the one through line, and all of that was that they kept intact the Third Amendment. When we apply that analysis to the current theory, we see that the one constant of every action they took is an fully compensated, appropriately compensated for the massive investment they provided. Mr. Caterberg, the most powerful factual evidence against your position about massive compensation is that, in fact, the Treasury has been massively compensated. One might almost liken they've been compensated a payday lender for the amount that they had to inject following the Now I'm too busy in my own rhetoric. My question is, I read some more or less current statement from FHFA to say that it is still interested in eliminating these conservatorships. After all, and how would an injunction, in fact, tie the hands or seriously limit what FHFA would do going forward? Why would it make the courts do something that's not within our competence for it to basically place a goad under FHFA to do what it said it's going to do anyway? Yes, Your Honor. And the reason why it would be problematic is that the injunction that Mr. Thompson wants is a very, very specific injunction that does a very specific thing. There are a variety of ways, a variety of potential paths for GSC to perform. And as has been discussed at length this morning, it's very complicated. There's a number of stakeholders and there's a number of issues that are at stake, and they're all interlocked. How are we going to do housing going forward in this country? How does Treasury get properly compensated? And these matters are for the executive branch, for FHFA and Treasury, potentially for Congress. There's a keen congressional interest in this. And so for the court to dictate one particular thing of that, that's a very consequential thing having to do with how Treasury's investment and whether it's just going to be written off would take power away from where it's supposed to be, which is in the hands of the people that are accountable to the electorate. So, Your Honor, again, there's four things, four specific things you can look at. It's the March 2019 presidential memorandum to Treasury telling them to develop a report on housing reform options that you see in there twice. Twice, they talk about how the imperative goal is to ensure that Treasury is appropriately compensated. And then we see... I'm just wondering, are you answering a question? Because your time's up. I apologize, Your Honor. We would ask the court to affirm the judgment below. Thank you. Mr. Sinzak? Thank you, Judge Owen. May it please the court, Jerry Sinzak, appearing on behalf of the Treasury Department. Plaintiffs here ask the court to take the dramatic step of writing off Treasury's liquidation preference on the theory that the former president was prevented from doing so by the removal restriction on FHFA's director. That theory is baseless for the reasons this court explained in its prior en banc opinion. And I think that also explains why a remand is unnecessary here. As this court recognized, and it is obviously the case, the former president had plenary authority over the Secretary of Treasury at all times during his presidency. And he accordingly had plenary authority over Treasury's interest in the GSEs throughout his presidency. And so the removal restriction clearly did not prevent him from eliminating that liquidation preference if that was his desire at any time. And the fact that he did not do so, in some ways, it's irrelevant because the point is he had the control over the enterprises at all times, or over Treasury's interest in the enterprises at all times, and could have written it off. And as this court also pointed out, secondly, as a factual matter, when he appointed his own directors, they both defended the Third Amendment and defended the scheme that had been in place for quite a while. But aside from that, they actually negotiated changes to the amendment that increased Treasury's liquidation preference. So that factual point, which is also not subject to dispute, further undermines plaintiff's claim that the former president had a desire to write off Treasury's liquidation preference. And so can you help me explain how we could affirm the judgment of the district court consistent with the Supreme Court's mandate? Sure. I think as this court pointed out in footnote six of its remand opinion, here plaintiffs are alleging that they were harmed because the president lacked sufficient control over Treasury's interests in the enterprises. And that has to be their argument because that's the harm they've always alleged. It's Treasury's interest. Let's just talk about the constitutional claim. So they've won the constitutional claim, right? There's nothing left to do except to enter judgment in their favor on the unconstitutionality of the four-cause removal restriction, right? That's correct. So I don't understand how you say over and over in your brief from page three where you start to page 17 where you end, over and over we ask that you affirm the judgment of the district court dismissing the complaint with prejudice. But it sounds like you're asking for the opposite, which is we should send it back to the district court for entry of judgment in their favor and the only dispute is how much judgment in their favor they get. Your Honor, yes, I apologize if we wrote that. I mean, it was mistaken in the sense that this was a constitutional claim. I appreciate that. It sounds like so now we have some agreement that it has to go back to the district court. So why in the world would we not just send it back to the district court for you and Mr. Kederberg and Mr. Thompson and you guys can all talk about whatever it is you want to talk about with respect to the scope of the judgment in the plaintiff's favor? But it seems like if you read the briefs in this case, you and the FHFA defendants disagree about what the judgment should be. So if the defendants disagree, then it seems like it would be quite obvious that we shouldn't try to wade into this, given that even on your side of the V, you can't agree about the scope of the judgment. I don't think the defendants are in disagreement that the judgment should say any more thing more than, you know, to rule for plaintiffs on the constitutional claim and sever the removal restriction. I'm sorry, I thought we just established in your brief you say over and over again for 14 straight pages that the only remedy is to affirm the judgment of the district court dismissing the complaint. Mr. Kederberg says the opposite in his brief. I gather that now we have an agreement at the oral argument that it should go back to the district court. So that's all I was trying to clarify. Yes, I mean, as you said, if our point was primarily in our brief that on this question of the remedy plaintiffs are seeking is inappropriate and that in fact they cannot establish under any set of circumstances that the president lacked control over treasury's interest in these enterprises and therefore under no set of circumstances can they show that the removal restriction harmed them or in the way that they're proposing. I guess what I'm confused about is that the Supreme Court of the United States specifically said they get the chance to do that. Now I understand your point that that they aren't going to be able to succeed, but the Supreme Court specifically said there must be litigation on this question. That's why we're sending it back. We cannot at this point establish that the plaintiffs lose. So why not just go back and do what the Supreme Court instructed you to do, which is to litigate the question? Well, I think plaintiffs are even here today arguing that there's no need for a remand that this court can decide the question on their complaint on the facts that have been raised in the brief. And again, there's no reason this court should send it back because as we pointed out, there's no evidence plaintiffs could offer to establish that the president lacked control over the treasury department. And in fact, what evidence there is points to that when he had the opportunity, when he appointed his own director, he took the opposite approach and did the very opposite of what plaintiffs are suggesting. But the fundamental point here and the fundamental hurdle plaintiffs can't get over is that he had control over treasury's interest at all times. And plaintiffs themselves aren't disputing that, you know, discovery would shed light on this or anything along those lines. And didn't the Supreme Court expressly say that this argument about the treasury having the power is something that that should be resolved in the first instance by the lower courts? So it didn't say that's a bad argument or that's wrong, or we disagree. Just said here, send it back. And it didn't say we're sending it back to the Fifth Circuit and they better send it back to the district court. It just said we're sending it back. Address it. So here we are. I certainly agree with that. Yes, Your Honor, that is precisely what they said. They didn't specify that further discovery or anything was necessary. And what's your response to the question I asked Mr. Katterberg about? Couldn't you all from the very start have said, man, we agree this this third amendment sweep is a mess. We, you know, blah, blah, blah. We totally agree with that. We want to settle this and so on. Couldn't you all have done that from the start? Well, the start 2017, the case was actually filed in 2016 when it was a different president, but then President Trump. But once it came to us and most of the time in the district court, you had President Trump and you could have from the very start, right, have agreed with the plaintiffs. That's correct, Your Honor. The former president could have ordered, you know, Secretary of Treasury to settle the case and settled it on behalf of the plaintiffs and in whatever fashion he desired. And he certainly could have written off the liquidation preference at any time. And what is your response to the issue of now that we have yet another president? How does the going with what President Trump would have done affect the fact that we now have President Biden? And what have where does that put us? I'm just a little confused about. Yeah, I mean, I think, you know, it is difficult to say exactly how to handle this. And I think this is in that circumstance. I, you know, again, I think that's why there's no reason to expect or to hold. And this court made this point in its initial en banc opinion to turn separation of powers on its head to suggest that this court should take an action for the benefit of the president that the president could have taken and chose not to. So and I think now you're getting to circumstance where you're adding a second president who may have other views and may have done something differently, or may have done the same thing or so forth, and it gets far too complex. And again, the fundamental point here is simply that the president had control over Treasury at all times could have reduced Treasury's interest in these enterprises at all times. And that's sufficient to answer the question whether the removal restricted restriction, prevented him from reducing that interest. Well, Mr. Simstack, since it seems to me that the obvious response to that is that the Supreme Court could have just remanded with instruction standard judgment accordingly, if it had felt that the authority of Treasury was sufficient to counteract what happened here. But it didn't do that. Yes, Your Honor. I mean, I think, you know, I can only speculate as to what the certainly the Supreme Court didn't reject in any sense, the argument that Treasury's involvement negated any potential harm here. And I think it expressed a fair amount of skepticism. But I mean, it would have been very easy for the court to have taken that position, it seems to me, very easy. Well, I'm not I'm not so sure about that. I mean, in part, I think because plaintiffs arguments really have evolved. I think if you look at the Supreme Court's opinion and their arguments before the Supreme Court, it was about the adoption of the Third Amendment. And now they've sort of moved on from that. So I can imagine the Supreme Court feeling, you know, they decided the adoption point on different grounds than this court had previously done so that they felt they weren't quite ready to decide that additional issue. So they remanded, but they certainly left open the possibility that this court would simply reinstate its prior en banc remedial holding and dismiss the case on that ground. And so do you dispute that the former president would have fired Mr. Watt if he had the lawful authority to do so during his administration? Your Honor, I think you know, there's a view certainly this the administration, his administration to view that he was removable for cause. I don't think ultimately, this court needs to answer the question of whether he would or wouldn't have removed him. I'm trying to understand the Justice Department's position. So within hours of the Supreme Court's decision, the Biden administration removed the director. I'm curious if you think that the former president would have done the same thing if he'd had that authority during his administration. Well, Your Honor, I mean, well, all I could say is his administration, the DOJ under his administration was of the view that he had the authority to remove them at any time. You know, so I can't say what would have happened. He certainly never tried to do so. And there's certainly no record of obviously a court order requiring him to do so. But there's now unrebutted evidence that he would have done it. And there's a demonstrated track record that this particular position and housing finance more generally is a hotly contested political issue. And I'm trying to figure out if there's something that the United States government has on the other side to counter the proposition that he would have fired Mr. Watt if he'd had the authority to do it. Well, I mean, look, we're not here getting into a dispute. We don't think the court has to resolve that question. Let me put it that way. You know, obviously, because the fundamental question here is whether the removal authority or whether he would have removed them and affected Treasury's interest in these or the ability of the president to control Treasury's interest. And we don't think there's any obviously there's no evidence of that because he could have controlled it at any time. He could have ordered the secretary of Treasury to take action at any time to reduce that interest. And he didn't. And in fact, yeah, he he his appointed FHFA director took the opposite approach and negotiated an increase in that liquidation preference. But if there's undisputed evidence in front of us that he would have removed the FHFA director if he'd had the lawful authority to do it during his administration, then we are living in a counterfactual world where we're just imagine we're now we're just disputing what else would have happened in this counterfactual world with a new director. Well, I think what we're what we're discussing is whether that removal restriction in in whether however the president felt about it caused harm to plaintiffs in the particular harm plaintiffs have identified, which is what they have to identify since it's Treasury's interest in these enterprises is that Treasury's interest was too great and the president would have reduced that interest. And we know just as a plain matter that the president at all times had control over that interest and certainly wasn't the removal restriction that prevented him from reducing. Mr. Sinsack, you say that you imply that the Treasury head could have removed the liquidation preference unilaterally, but wasn't that part of a deal whereby Treasury agreed to backstop losses by Fannie Mae and Freddie Mac up to hundreds of billions of dollars? And therefore, removing the preference unilaterally would certainly have cast into doubt that other responsibility, wouldn't it? I don't think so, Your Honor. I mean, Treasury could have written to or FHFA and said, please write down our liquidation preference, but we'll keep the commitment in place. There's no reason why FHFA or Treasury couldn't have done that or the president couldn't have ordered it. Well, because that would have had adverse budget complications, would it not? Or at least it would have been open to serious political attack for Treasury just to agree to be the guarantor of national mortgage finance. Your Honor, I fully agree that there are many reasons why the president wouldn't have ordered Treasury to reduce its liquidation preference. Well, that's what we're dealing with in this counterfactual world, isn't it? Well, no, because the only counterfactual this court is considering is whether the removal restriction prevented the president from reducing Treasury's liquidation preference. And it certainly was not the removal restriction that limited his ability to do so. He could have done so at any time. Well, political, but it was part of the matrix of considerations that would be relevant on remand, it seems to me. Your Honor, I respectfully disagree because the only question here is whether the removal restriction prevented the president from reducing Treasury's interests, and it didn't. And other factors might have, he may not have wanted to do it in the first place, or any other number of factors might have prevented him. Mr. Sinzak, can I just sneak in a quick question, just the same question I noticed you both litigated in front of the Eighth Circuit. After Collins was decided, did that court receive supplemental briefing? And if so, what was the argument you took there? Your Honor, I think we submitted supplemental briefs on these questions, and we took a position that it should follow this court's decision on its en banc remedial holding. And as you know, the court remanded. It didn't suggest that it was rejecting that view or rejecting that holding, but it simply remanded the case. Okay, thank you. Thank you, Your Honor. Mr. Thompson. Thank you, Chief Judge Owen. Let me just start by saying we are certainly amenable and understand the reasons why it might well make sense to have a remand to the district court. But nevertheless, if I may just address a few points that have come up this morning. Number one, there was a claim that what we're trying to do here is entirely new as compared to our positions previously. And what we're trying to do is to conform to the Supreme Court's mandate. And these are difficult issues, but that's a reason why the burden should be on the government. Once we've shown that the inequal protection cases, First Amendment cases, even under this court's Second Amendment jurisprudence. Second of all, the Norton case was referenced by my friends on the other side. That's a liability case. Here we've had liability entered in our favor. Third, there was a reference to 4617F, but it would have been odd for the Supreme Court to have just adjudicated the understanding of 4617F and then to send the case back to this court and to the Southern District of Texas if 4617F was a complete barrier to relief. And I might add that 4617F doesn't come close to the type of clear statement that Webster v. Doe would require in order to foreclose our constitutional claims. There was a question about the norm of the Department of Justice defending agency action. And there was a reference to the fact that, well, the Department of Justice didn't defend the constitutional structure of FHFA. And within the Department of Justice, the norm I referenced in my opening prepared remarks does not obtain or is much weaker when you're talking about congressional legislation that takes power away from the executive. And that's why, on the one hand, it was consistent with that norm to defend the agency action, and on the other hand, it was consistent with DOJ practice not to defend an incursion on executive authority. Mr. Thompson, this is Judge Costa. I have a question following up on Judge Oldham's question for the other side. Why didn't President Trump remove Director Watt? The DOJ had opined that the removal restriction was unconstitutional. Of course, the Constitution overrides statute. And if you look historically at how a lot of these cases have reached the courts, it was when the President said, I'm going to exercise my statute says. So why didn't President Trump just take that action right after getting elected? Well, there was obviously a lot of contestation about whether the FHFA was actually constitutionally structured or not. The Supreme Court was divided on that question. There was extensive briefing from the court-appointed amicus, had 50 pages of briefing as to why the FHFA was to self-help. I credit the fact that sometimes administrations do resort to self-help, but here they did not, and they weren't required to resort to self-help, we would say. In addition, there was a question about, well, we have a new administration now, and there might be further administrations after that. I think to be analytically clear, there's only one question before the court. What is the counterfactual of the Trump administration? What would the Trump administration have done if it had had two more years? There was a question about whether writing the liquidation preference would tie the hands of the current administration in terms of ending the conservatorship, and you will notice that my friends on the other side could not identify any way in which this would tie the hands of the current administration in terms of ending the conservatorship. There was a question about, well, why wasn't there settlement? But the Trump administration was not required to capitulate to the demands of the shareholder and was within its right to end the liquidation preference and the conservatorships on its own timetable. And finally, there was a question about, well, doesn't the Treasury involvement in this whole process somehow cleanse any harm flowing from the forecast removal protection? Treasury could not unilaterally amend the PSPAs. It took an agreement of Secretary Mnuchin and Director Calabria to end the cash payments, and Secretary Mnuchin could do nothing to promulgate a capital rule, which was an important prerequisite to ending the conservatorship and selling the government stock. That was all Director Calabria. Treasury had nothing to do with it. And so we thank the court for its attention today. Thank you, counsel. The court will take a brief recess between